## PERRY v. STATE.

No. A-11388. Sept. 5, 1951.

Rehearing Denied Oct. 10, 1951.

Further Rehearing Denied Dec. 12, 1951.

(235 P. 2d 963.)

348

Jess L. Pullen, Oklahoma City, and Brown Moore and Preston Moore, Stillwater, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

JONES, J. The defendant, Henry Archelaus Perry, was charged by an information filed in the district court of Oklahoma county with the crime of murder allegedly committed upon one Eugene F. McFerran, was tried, convicted of manslaughter in the first degree, and pursuant to the verdict of the jury was sentenced to serve four years in the state penitentiary, and has appealed.

No question as to the sufficiency of the evidence is raised by the appeal but counsel for defendant allege error in the giving of certain of the instructions.

In order to determine the issues it is necessary to relate a summary of the evidence. The defendant shot and killed the deceased McFerran on June 21, 1949, in front of the apartment house where the defendant Perry resided. Perry and McFerran for a few weeks prior to the homicide had occupied a real estate office together in Oklahoma City. Prior to the month of April, 1949, the defendant had been a real estate broker in Oklahoma City for many years. The defendant Perry about two months prior to the homicide moved into the office occupied by the deceased McFerran. Subsequent to that date the defendant moved from the Dean Hotel, where he was living, to the apartment house of Mrs. Alta Mae Hudelson, who was a sister-in-law to the deceased, and he continued to occupy a room in this apartment house until the death of McFerran occurred. On or about June 10, 1949, the defendant completed the sale of an apartment house belonging to one Victor Collins to C. R. Strong of Stillwater. Mr. Strong paid the defendant a $500 commission on the sale. Later the deceased learned of the commission which had been paid to Perry and he contended that he was entitled to one-half of the commission because of the partnership relationship which he and Perry bore towards each other at the time the sale was consummated. Perry did not pay any part of the commission

to McFerran and it was his contention that Collins had listed the apartment house with him for sale before he moved into McFerran's office and that under the agreement which he had made with McFerran both he and McFerran were entitled to the commissions which each might receive upon the sales of property which had been listed with them prior to the time Perry moved into the office with McFerran.

The defendant proved by several witnesses that McFerran had had conversations with them and had used violent language in speaking of the defendant and in some of these conversations he went so far as to threaten physical violence or even death upon the defendant if he did not pay one-half of the commission received from the Collins' sale to him. Some of these threats were communicated to the defendant.

There is very little dispute as to the facts immediately surrounding the homicide. About 4:30 p. m. on June 21st Perry was standing at the north entrance of the apartment house where he resided, which was also the home of the mother-in-law of the deceased and the sister-in-law of the deceased who was the owner of the building. The wife of the deceased testified that she and McFerran went by each day to see her mother before they drove to their home in Nicoma Park and that they stopped at the apartment house as was customary with them and that they were accompanied by their two small grandchildren. When the deceased drove up in front of the apartment house and stopped, Perry started walking from the north entrance of the apartment house over to the porch leading to the south entrance. He was seen by the deceased who said, "Hey Perry I want to speak to you". The defendant said that the deceased was very angry and acted in a threatening manner. The defendant related that he said, "McFerran I don't want to talk to you", and that the deceased then cursed defendant and said, "I am going to talk to you"; that he kept advancing towards him and defendant thought McFerran had a gun and so defendant shot him. Only one shot was fired and it entered the chest of the deceased, killing him almost instantly. The deceased was unarmed.

The first assignment of error is that the court erred in giving instruction No. 21, which reads as follows:

"Evidence has been introduced herein upon the part of the defendant, tending to prove that prior to the fatal difficulty the deceased had made threats of violence against him, and such threats, should you find the same to have been made, should be considered by you in connection with all the other evidence in the case, to assist you in determining the feelings of the deceased towards the defendant and to assist you in determining who was the probable aggressor in the fatal difficulty. But mere threats alone, though actually made and communicated, and however violent they may be, will not justify, excuse or mitigate a homicide.

"The law does not permit one person to kill another merely because the other has made threats against him, unless the deceased, at the time of the fatal difficulty, without being wilfully provoked thereto by the defendant, and without the defendant having brought on the difficulty, made some overt act or demonstration, indicating to the defendant, as a reasonable person, an intention to kill him or do him some bodily harm;

"And should you find in this case, beyond a reasonable doubt, that at the time of the fatal difficulty the deceased did not make some overt act or demonstration indicating to the defendant, as a reasonable person, an intention to assault him and to do him some serious bodily harm or to kill him, then any threats previously made against the defendant are immaterial for any purpose in this case, and should not be considered by the jury, but entirely disregarded and given no weight whatever under such circumstances."

It is counsel's contention that the latter part of this instruction nullified the entire instruction.

. In the case of Brantley v. State, 15 Okla. Cr. 6, 175 P. 51, this court set forth in the opinion a set of approved instructions that applied to that murder case. For the defense in that case there was evidence of communicated threats. Instruction No. 16 given by the trial court was essentially the same as Instruction No. 21, which is here under attack. The instruction in the Brantley case concluded in almost the identical language as that of the instruction here involved. It read:

"The law does not permit one person to kill another merely because the other has made threats against him or previously assaulted him, unless the deceased, at the time of the fatal difficulty, without being willfully provoked thereto by the defendant, and without the defendant having brought on the difficulty, made some overt act or demonstration, indicating to the defendant, as a reasonable man, an intention to kill him or to do him some great bodily harm; and should you find in this case beyond a reasonable doubt that at the time of the fatal difficulty, that the deceased did not make some overt act or demonstration indicating to the defendant, as a reasonable man, an intention to assault him and do him some serious bodily harm or kill him, then any threats previously made against the defendant, and the fact that there had been a previous difficulty, are immaterial for any purpose in the case, and should not be considered by the jury, but entirely disregarded, and given no weight whatever under such circumstances."

We have read the entire set of instructions which were given by the court. There were thirteen separate instructions pertaining to the law of self-defense. Some of them were repetitious and it was unnecessary to give them, but the repetitious ones were strongly in favor of the accused in that they unduly emphasized by repetition defendant's right to stand his ground without retreating, and to resort to the use of such force and violence as seemed reasonably necessary for his safety, even to the taking of human life, and that the danger need not be real but only apparent and that in viewing the danger or apparent danger to defendant the jury should view the same from the standpoint of the defendant and from no other standpoint. Some of these instructions read:

"The right of self-defense is the right which the law not only concedes but guarantees to all men. The defendant may, therefore, have killed the deceased and still be innocent of any offense against the law.

"If you believe from the evidence that at the time the defendant shot the deceased with the pistol in question he believed and viewed from his standpoint he had reasonable grounds to believe that he was then and there in danger of death or of the infliction of great bodily harm at the hands of the deceased, and that it was necessary or seemed to the defendant, in the exercise of reasonable judgment, to be necessary to strike and kill the deceased in order to protect himself from death or the infliction of great bodily harm at the hands of the deceased, then you will find the defendant 'not guilty'."

"You are instructed that a person may repel force by force in the defense of his person, property, or life, against one who manifestly intends or endeavors by violence to commit a known misdemeanor or felony, or either, or to do great bodily injury to his person, and the danger which would justify the defendant in the act charged against him may be either real or apparent, and the jury are not to consider whether defendant was in actual peril of his life or suffering great bodily harm, but only whether the indications were such as to induce a reasonable man to believe that he was in such peril of his person, and if he so believed, reasonably, and committed the act complained of under such belief, even though it should appear that the deceased was not armed, you should acquit the defendant."

"It is not necessary to the plea of self-defense that the defendant's danger should be actual or real. All that is necessary is that the defendant, from his standpoint, under all the facts and circumstances then existing, or by him honestly believed to be true, has reasonable cause to believe and does believe that he is in such threatened danger. The defendant's belief of that fact, however, must be a reasonable one; that is, he must have reasonable cause for such belief, and such belief, however honest it may be, if the facts and circumstances then existing and known to the defendant or by him honestly believed to be true furnish no reasonable cause for such belief, it would constitute no justification for a homicide, for men do not hold their lives subject to the unreasonable fear or excessive caution of others.

"A reasonable cause for such belief is such an overt act or demonstration made by the deceased at the time of the altercation which, considered in the light of all the facts and circumstances then existing and known to the defendant, or by him believed to be true, would create in the mind of a reasonably prudent and cautious person in like situation, an honest belief that the deceased then and there intended to kill him or inflict upon him great personal injury, and that it was necessary to kill the deceased in order to prevent such threatened danger to him.

"What acts or demonstrations do or do not constitute such reasonable cause and whether or not any were made, are questions of fact to be determined by the jury upon consideration of all of the facts and circumstances in evidence before you."

"You are instructed that evidence has been admitted showing that the deceased had made threats toward the defendant, and that these threats had been communicated to the defendant, Mr. Perry, by certain of the witnesses; and if the deceased by some action at the time of the fatal difficulty manifested a purpose to carry out such threats, and if from the words and acts of the deceased it then reasonably appeared to the defendant, from his standpoint, that the deceased did intend to carry out such threats, viewing all of the circumstances from the standpoint of the defendant at that time, then and in that event the defendant would have the right to defend himself even to the extent of the taking of the life of the deceased."

"You are instructed that neither threats by the deceased, if you believe they were made, nor the bad reputation of the deceased, if you believe he had such a reputation, will justify the homicide in this case if you believe beyond a reasonable doubt that the defendant was the aggressor or that he entered voluntarily into the conflict."

"One who, by his wrongful conduct, provokes or brings on an altercation, is called the aggressor.

"An aggressor is not allowed the right of self-defense, even though his or her life is placed in imminent danger. But one who is not the aggressor and is in a place where he or she has a right to be, when violently assaulted, or when, by the hostile conduct or demonstration of another, he or she is induced to apprehend a design on the part of the latter to take his or her life, or inflict upon him or her some great personal injury, may, without retreating, stand his ground and resort to the use of such force and violence as to him or her seems reasonably necessary for his or her own safety, even to the taking of life, and such killing will be justified on the ground of self-defense even though such danger is not real, but apparent; and in this case, unless you shall find from the evidence, facts and circumstances, as disclosed upon the trial, that the defendant was the aggressor, you will determine therefrom as to whether or not the defendant had reasonable grounds to apprehend that —he was in imminent danger of losing his life or of receiving some great personal injury at the time he shot the deceased, and in so doing you will view the same from the standpoint of the defendant who acted upon them and from no other standpoint."

"You are instructed that the term 'aggressor' as that term is used in these instructions, means the one who wrongfully commits the first act of hostility or offense, that is, the one who wrongfully begins or starts the fatal difficulty."

We have often said that where counsel are dissatisfied with instructions that are given, or desire the court to give any particular instruction, or to more definitely or sufficiently state any propositions embraced in the instructions, it is the duty of counsel to prepare and present to the court such desired instruction and request that it be given, and in the absence of such request this court will not reverse the case where the instructions generally cover the subject matter of the inquiry. Broyles v. State, 83 Okla. Cr. 83, 173 P. 2d 235; Doolin v. State, 90 Okla. Cr. 188, 212 P. 2d 136; Sheehan v. State, 83 Okla. Cr. 41, 172 P. 2d 809.

We are also committed to the rule that the instructions must be considered as a whole, and, when considered altogether, if they fairly and correctly state the law applicable to the case, they will be sufficient. Walker v. State, 89 Okla. Cr. 19, 204 P. 2d 552; Wingfield v. State, 89 Okla. Cr. 45, 205 P. 2d 320.

In this case counsel for defendant presented two requested instructions and the court gave both of the requested instructions in their entirety, although he had already in the instructions which he had prepared used substantially the same language as was used in the requested instructions. In giving the requested instructions of the defendant the court unnecessarily through repetition emphasized the defendant's theory of the case. Counsel complain of the giving of Instruction No. 11, which is the next to the last instruction hereinabove quoted, for the reason that there was no evidence that defendant was the aggressor. The evidence of Mrs. Hudelson, Mrs. McFerran, Jay Smith, and Jennie White, would support a conclusion that defendant was the aggressor at the time of the fatal difficulty. The fact that defendant was armed with a pistol which he had purchased some two months before would lend weight to a finding that he was probably the aggressor. However, no exception was saved to the giving of instruction No. 11, and after reading the same we do not find it to be fundamentally erroneous. On the other hand, it is a fair statement of the law.

Instruction No. 22, which is attacked, has served as a model instruction for the district courts of this state in cases similar to the instant case since the opinion of the court in the case of McDaniel v. State, 8 Okla. Cr. 209, 127 P. 358. Moreover, no exception was taken to the giving of this instruction.

It is our conclusion that the jury was fairly instructed. The jury gave great weight to the threats, both communicated and uncommunicated, which had been made by the deceased toward the defendant, and undoubtedly the evidence of these threats and the manner in which they were portrayed by counsel for the accused caused the jury to only give the defendant the minimum punishment of four years for manslaughter in the first degree, when under the evidence he was entitled to a more severe punishment. Defendant shot an unarmed man and even under the testimony of defendant there was no sufficient provocation at the time of the shooting to justify such action.

The judgment and sentence of the district court of Oklahoma county is affirmed.

BRETT, P. J., and POWELL, J., concur.